## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No:

ERIC JOHNSON,

Plaintiff,

    v.

DEPARTMENT OF PUBLIC WORKS, SOLID WASTE MANAGEMENT; CITY AND COUNTY OF DENVER, a municipal corporation, KATHY BILLINGS, individually and in her representative capacity; MIKE LUTZ individually and in his representative capacity; LARS WILLIAMS, individually and in his representative capacity; CHARLOTTE PITT, individually and in her representative capacity; and RICHARD VILLA, individually and in his representative capacity,

Defendants.

---

### Complaint Under Title VII of the Civil Rights Act of 1964, 42 U. S .C. § 2000e; The Civil Rights Act of 1866, 42 U.S.C. § 1981; the Civil Rights Act of 1871, 42 U.S.C. §1983 and Jury Demand

---

Plaintiff, Eric Johnson, by and through his attorneys, Joseph C. Cohen, P.C., by Joseph C. Cohen, and Elizabeth Connell, Connell & Connell, LLC, states for his Complaint:

### PARTIES

1.    Plaintiff, Eric Johnson, an African American, is a resident and citizen of the State of Colorado and at all times pertinent hereto was a resident of the State of Colorado.

2.    Defendant, Solid Waste Management (hereinafter referred to as "SWM") is a section of Denver Public Works Operations for the City and County of Denver and, as such, its principle place of business is the State of Colorado, and it is qualified to do and does business in the State of Colorado.

3.     Defendant City and County of Denver at all times relevant to the case at bar has been and continues to be a chartered home-rule municipality in the State of Colorado.

4.     Defendant Kathy Billings (Caucasian) works for SWM at the Office of Human Resources and at all times relevant to the case at bar had the authority to make personnel decisions regarding Mr. Johnson's and all SWM employees' employment.

5.     At all times relevant to the case at bar, Defendant Mike Lutz (Caucasian) worked for SWM as a Manager and had the authority to make personnel decisions regarding Mr. Johnson's and all SWM employees' employment.

6.     At all times relevant to the case at bar, Defendant Lars Williams (Caucasian) worked for SWM as its Director and had the authority to make personnel decisions regarding Mr. Johnson's and all SWM employees'employment,

7.     At all times relevant to the case at bar, Defendant Charlotte Pitt (Caucasian) worked for SWM as a Manager and had the authority to make personnel decisions regarding Mr. Johnson's and all SWM employees' employment.

8.     At all times relevant to the case at bar, Defendant Richard Villa (Hispanic) worked for SWM as its Operations Supervisor and had the authority to make personnel decisions regarding Mr. Johnson's and all SWM employees' employment.

## JURISDICTION AND VENUE

9.     Subject matter jurisdiction is proper in this Court pursuant to 42 U.S.C. § 2000e, et seq., 42 U.S.C. § 1981, and 42 U.S.C. § 1983.

10.     SWM is an employer within the meaning of 42 U.S.C. § 2000e, et seq., 42 U.S.C. § 1981 and 42 U.S.C. §1983.

11.     The unlawful employment practices alleged herein took place at the Cherry Creek Transfer Station located at 7301 E. Jewell Avenue, Denver, Colorado 80231.

12.     Venue is proper in the United States District Court for The District of Colorado pursuant to 29 U.S.C. §1132(E)(2).

## ADMINISTRATIVE PROCEDURES

13.     Mr. Johnson filed a charge of discrimination with the Equal Employment Opportunity Commission (the "EEOC") alleging discriminatory conduct based on Mr. Johnson's race by SWM on July 30, 2013 (Exhibit 1).  The EEOC issued a Notice of Right to Sue on April 30, 2014 (Exhibit 2).

## NATURE OF THE CASE

14.     Title VII of the Civil Rights Act of 1964, 42 U. S .C. § 2000e-2(a)(1) provides in pertinent part that it is unlawful for a covered employer "to discharge any individual, or otherwise to discriminate against any individual with respect to his . . . terms, conditions, or privileges of employment, because of such individual's race."

15.     The Civil Rights Act of 1866, 42 U.S.C. § 1981, grants all persons the same right to "make and enforce contracts…as is enjoyed by white citizens."

16.     The Civil Rights Act of 1871, 42 USC § 1983, provides that "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . ."

17.     SWM discriminated against Mr. Johnson because of his race, treating him differently than similarly situated employees not of the same race by excluding him from participating in programs designed for advancement within SWM and ultimately terminating his employment for discriminatory reasons.

## GENERAL ALLEGATIONS

18.     Plaintiff, Eric Johnson, was employed with the Solid Waste Management Section for the City and County of Denver Department of Public Works for twelve years, from June 16, 2001- July 5, 2013.

19.     At all times material to the case at bar, Mr. Johnson was based at the Agency's Cherry Creek Transfer Station (Station).

20.     The Station is where trash is transferred into tractor-trailers for transport to the City landfill.

21.     On June 16, 2001, Mr. Johnson began working for SWM as a Senior Utility Worker.

22.     On July 10, 2011, Mr. Johnson's position at SWM changed; he was promoted from Senior Utility Worker to become a Heavy Equipment Operator.

23.     Mr. Johnson continued to work as a Heavy Equipment Operator until his employment was terminated on July 5, 2013.

24.     At all material times, Mr. Johnson's work schedule required him to work four 10-hour shifts, Tuesday through Friday from 6:30 am to 5:00 pm.

25.     At the time of his termination, Mr. Johnson's immediate supervisor was Richard Villa.

26.     Mr. Johnson's employment was terminated because SWM believed that he had involvement in illegal dumping activities that occurred at the Station on May 24, 2013.

27.     On Friday, May 24, 2013, Mr. Johnson reported to work as usual and arrived on time.

28.     He and his co-workers completed their work early, at approximately 4:00 pm.

29.     There was no additional work for them to complete; however, they had to remain until the end of their scheduled shift.

30.     Mr. Johnson, along with co-workers Darrell Boone (African American), Daniel Abeyta (Hispanic), Tim Aguilar (Hispanic), and Ralph Gashler (Caucasian), sat around talking at the employee break area at the top of the Hill while waiting until their shift expired. Solid waste brought into the Station is dumped inside the Fleet Building.

31.     The Hill is located within the Station on the Northwest side.

32.     On the Hill there is an employee break area, where there are benches and a grill.  The Hill also provides road access to part of the dumping facility. Persons in the break area on the Hill cannot see into the Fleet Building.

33.     At 4:30 pm, Mr. Gashler left the group to pick up his daughter and returned to the site with his daughter at around 4:50 pm to clock out.  Along with his daughter, Mr. Gashler then went to the mechanic's bay to use their air pump to fill his tires.  This occurred after his shift ended.

34.     Mr. Aguilar, who already had his car at the top of the Hill, drove down to the main area to clock out.   He then drove back up to the mechanic's bay area to fill his tires with air. This occurred after his shift ended.

35.     Mr. Johnson, Mr. Boone, and Mr. Abeyta walked from the Hill to clock out.

36.     Mr. Johnson clocked out at 4:53 pm. After everyone clocked out, Mr. Aguilar drove Mr. Johnson and Mr. Boone back up to the break area on the Hill so that they could all continue talking.

37.     Mr. Gashler and his daughter left the premises approximately fifteen minutes later.

38.      Mr. Aguilar left the premises between 5:30 and 5:45.

39.     At some point during their conversation on the Hill, Daniel Abeyta disappeared.

40.     Only Mr. Boone and Mr. Johnson remained on the Hill to continue talking.

41.     At about 7:00 pm, Mr. Johnson and Mr. Boone decided to leave and began walking down the Hill over to the main area.

42.     As both of them walked toward the gas pumps, they noticed a gray truck with a trailer drive by them.

43.     This did not raise their suspicions as non-company vehicles frequently came in and out of the Station.

44.     Upon exiting the Station, the trailer portion of the truck became unhitched and started heading towards Mr. Johnson and Mr. Boone.

45.     Both men placed their hands up in an attempt to stop the trailer from hitting them.

46.     Chris Reed (Caucasian), an on-call utility worker working for SWM, drove the gray truck that passed Mr. Boone and Mr. Johnson.  He reattached his trailer and drove away from the facility.

47.     At around 7:04 pm both Mr. Johnson and Mr. Boone left the Station through the main Gate. Mr. Johnson went to his car, which was parked outside the gate area.

48.     Mr. Johnson did not see where the gray truck went after it entered the Station and did not observe what occurred thereafter.

49.     On Tuesday morning, May 28, 2013, an employee of SWM, Art Padilla (Hispanic), discovered that the trailer portion of a tractor-trailer he was supposed to drive that day had two flat tires.

50.     Richard Villa, the operations supervisor took the trailer out of service until its tires could be repaired.

51.     The tires were repaired that afternoon and another employee Mark Rodriguez (Hispanic), was scheduled to fill the trailer with trash and drive it to the dump.  While completing a pre-trip routine, Mr. Rodriguez noticed that the trailer weighed significantly more than its rated capacity. It was supposed to weigh 20 tons prior to it being filled with trash.  However, it weighed 29.1 tons.  He climbed into the trailer and discovered that it was partially filled with roofing material.

52.     Mr. Padilla informed Richard Villa, who then took pictures of the roofing material and instructed Mr. Padilla to haul the trailer to the dump and dump its contents.

53.     Mr. Villa informed Dave Peachey (Caucasian), the field supervisor, about the trailer incident (Incident).

54.     Mr. Villa and Mr. Peachey viewed video recordings of the site from May 24, 2012, through the weekend.

55.     The video footage revealed the following occurred on May 24 between5:00-8:00 pm:

   a.     5:29 pm- A co-worker walking over to the key box, turning the gate to hold open and entering the fleet building.
   b.     5:32 pm- A co-worker is observed exiting the Fleet Building and walking over to where the transfer tractor/trailers are parked.
   c.     5:33 pm- A transfer/tractor trailer is moved off the line and is seen heading toward the transfer station chute.
   d.     5:53 pm-Truck #1 white truck (private vehicle) with wooden sides enters the Station and heads to the Chute area.
   e.     6:00 pm- Truck #1 white truck is seen exiting the Station.  The wooden sides have been removed.
   f.     6:26 pm-Truck #2 dark gray truck enters with a trailer that appears full and is covered with a tarp.
   g.     6:32 pm-Truck #3 light gray is seen entering the Station.  It does not have a load but appears to have metal tools or metal materials in the bed.
   h.     6:43 pm-A truck is seen backed into side one of the chute.  It is not clear if this is truck #1 or truck #2.
   i.     6:46 pm- A truck is seen pulling out of side one of the chute.  It is not clear which truck this is.
   j.     6:47 pm- Truck #2 is seen driving around the yard with a trailer but turns around and goes back to the chute area.
   k.     6:55 pm-Truck #2 leaves the station without a trailer
   l.     6:59 pm- Eric Johnson and Darrell Boone walk towards the main gate
   m.     7:02 pm-Truck #2 enters the transfer station with a trailer attached.  It drives by Mr. Johnson and Mr. Boone.  The trailer has a tarp on it and looks full.
   n.     7:04 pm-Eric Johnson leaves the station.

56.     There is no video footage of Eric Johnson dumping any illegal material in the site.

57.      There is no video footage of Eric Johnson driving any private vehicle into the facility

58.     There is no video footage of Eric Johnson driving a truck into the facility.

59.     There is no video footage of Eric Johnson driving a truck with a trailer into the facility.

7

60.     The only video footage with Mr. Johnson in it is that of a truck driving past him and Mr. Boone as they left the facility.

61.     On May 29, 2013, Mr. Peachey asked Mr. Johnson, Mr. Boone, and Mr. Abeyta to provide individual written statements regarding their activities on May 24, 2013, between the hours of 5:00-8:00 pm.

62.     Mr. Johnson submitted his statement on May 29, 2013, indicating that between 5:00-8:00 pm on May 24, 2014, he was on the Hill talking with his fellow co-workers.  (Exhibit 3)

63.     Mr. Johnson was wrongfully accused of being involved in illegal dumping activities on May 24, 2014.

64.     In a letter written by Richard Villa describing the Incident he incorrectly refers to the trailer that was reported to contain the illegal roofing materials as BZ15. (Exhibit 4)

65.     BZ15 was the trailer assigned to Eric Johnson.

66.     The actual trailer that was damaged due to the illegal dumping Incident was BZ13.

67.     BZ13 was assigned to another SWM employee, not Mr. Johnson.

68.     Approximately one week later, Charlotte Pitt, the Manager at SWM, told Mr. Johnson that she had an "interesting video" from May 24, 2013.

69.     She asked Mr. Johnson whether he wanted to update his statement.

70.     He declined to do so as his report was accurate and true.

71.     Mr. Johnson received a pre-disciplinary letter dated June 11, 2013 (Exhibit 5).

72.     This letter states that he was subject to discipline for the following alleged misconduct:

    a.     Allowing unauthorized individuals to enter the Station yard and illegally dump 30 tons of material resulting in damage to trailer BZ13's tires;
    b.     Unauthorized presence at the Station;
    c.     Failing to disclose
    d.     Making an untruthful statement; and
    e.     Not wearing protective equipment while on the Station premises.

73.     The June 11, 2013 letter refers to the trailer used as BZ15.

8

74.     Mr. Johnson then received an updated pre-disciplinary letter dated June 18, 2013, superseding the June 11, 2013, letter, which contained a minor correction to his disciplinary history. (Exhibit 6)

75.     The June 18, 2013, letter refers incorrectly to the trailer used in the Incident as BZ15.

76.     Mr. Reed, Mr. Padilla, Mr. Gashler, and Mr. Aguilar never received pre-disciplinary letters.

77.     On June 20, 2013, Mr. Johnson, Mr. Boone, and Mr. Abeyta were scheduled to attend a pre-disciplinary hearing.

78.     Each person appeared separately, with Mr. Boone going first, then Mr. Johnson, and finally, Mr. Abeyta.

79.     Present at that hearing were Kathy Billings (Office of Human Resources), Mike Lutz (Manager), Lars Williams (Director, Solid Waste Management), Charlotte Pitt (Manager), and Richard Villa (Operations Supervisor).

80.     They were there to determine what action, if any, needed to be taken against Mr. Johnson, Mr. Boone, and Mr. Abeyta.

81.      During Mr. Johnson's hearing, the group asked him to tell his side of the story.

82.     He indicated that they already had his written statement and he did not know what else to tell them.

83.     He denied any knowledge of any illegal activities that took place on May 24, 2012.

84.     At Daniel Abeyta's June 20, 2014 hearing, which occurred after Mr. Johnson's, Mr. Abeyta confessed to the members of SWM that he, alone, was responsible for the illegal dumping.

85.     During his pre-disciplinary hearing, Mr. Abeyta explained that he took one of the tractor trailers to the chute where he dumped roofing materials in an attempt to save on reroofing his house.

86.     He specified that Mr. Johnson had no involvement in the dumping.

87.     Messrs. Reed, Padilla, Gashler, and Aguilar were not the subjects of a pre-disciplinary hearing.

88.     Ken Padilla (Hispanic), a Heavy Equipment Mechanic, testified as a witness at the pre-disciplinary hearing.

89.     He testified that at some point during the time the gray truck was on the premises, it backed into the shop door at the mechanic's bay area.

90.     He gave a written statement on June 3, 2013 (Exhibit 7).

91.     In the statement, he indicates that a truck backed into his shop door.  Then someone asked

92.     him for an air chuck to fill up a tire.  He asked whether that person worked at the Station and the person replied, "No." Nonetheless, Mr. Padilla assisted this person in filling his tires.

93.     Mr. Padilla was working at the mechanic's bay on May 24, 2012, and testified to seeing more than one private truck at the Station during the time of the Incident.

94.     He testified that Daniel Abeyta was driving one of these trucks and waved to him.

95.     Daniel Abeyta had already clocked out and was on-site after hours.

96.     Mr. Padilla never questioned the presence of private vehicles and unauthorized persons on the premises.

97.     Mr. Padilla allowed, even helped, an unauthorized person fill air into the tires of a private vehicle, which was prohibited at the Station.

98.     Mr. Padilla did not report this activity to anyone.

10

99.     On July 5, 2013, Mr. Johnson was handed a letter terminating his employment (Letter) (Exhibit 8).

100.    It stated that Mr. Johnson's activities on May 24, 2012, were illegal because he allowed unauthorized individuals to enter the Station yard and illegally dump 30 tons of material resulting in damage to the trailer BZ15's tires.

101.    Additional reasons set out in the Letter purportedly justifying Mr. Johnson's termination

102.    included being on site at the Station after work hours (unauthorized presence), not wearing protective equipment while on site, not disclosing the presence of other vehicles on the premises, not reporting the illegal activity, and not disclosing any of the information regarding his observations in his written or oral statements.

103.    Darrell Boone and Daniel Abeyta also received letters of termination of employment.

104.    Mr. Aguilar and Mr. Gashler never received termination letters and continued to work for SWM despite being on-site after work hours and not wearing protective equipment on site.

105.    Mr. Reed and Mr. Padilla never received termination letters and continued to work for SWM despite not reporting the illegal activity and not reporting the presence of unauthorized vehicles or individuals at the Station.

106.    During the pendency of the investigation, Daniel Abeyta, the confessed guilty party in the Incident, was given investigatory leave with pay.

107.    Meanwhile, during the pendency of the investigation, the two African Americans, Eric Johnson and Darrell Boone did not receive investigatory leave with pay.

108.    This is not the first time that Eric Johnson felt that he was treated unfairly due to his race.

109.    In 2011, Charlotte Pitt denied Mr. Johnson's entry into a mentoring program at SWM.

110.    Mr. Johnson passed the required test to be part of the program and had three letters of recommendation from previous supervisors in support of his application.

111.    Ms. Pitt was in charge of the mentoring program at the time Mr. Johnson applied.

112.    SWM's mentoring program is designed to train employees toward management positions.

113.    Ms. Pitt denied Mr. Johnson's entry into the program although he was qualified.

114.    Ms. Pitt admitted two Hispanic employees to the program instead of Mr. Johnson, despite them not having passed the required examination.

115.    Only one African American employee (Henry Hudson) is in a supervisory role at the Station.

116.    Only one African American employee (Leston Reeves) has ever been admitted into the mentoring program during Mr. Johnson's tenure with the City.

117.    Mr. Johnson questioned Ms. Pitt about why he was not admitted into the mentoring program while less qualified people were.  Ms. Pitt did not provide an explanation.

118.    Charlotte Pitt was Mr. Johnson's manager at the time he applied for the mentoring program.

119.    Ms. Pitt was also involved in the investigation, disciplinary hearing, and subsequent firing of Mr. Johnson for the Incident on May 24, 2012.

### FIRST CLAIM FOR RELIEF
**(Violation of 42 U.S.C.A. § 2000e,** *et seq.* **- Disparate Treatment)**

120.    Mr. Johnson incorporates the foregoing and following paragraphs as though fully set  forth herein.

121.    Mr. Johnson is an African American.

122.    Mr. Johnson was qualified to perform his job at SWM.

123.    Mr. Johnson was treated differently than at least one similarly situated non-African American employee at SWM.

124.    Mr. Johnson was terminated because of his race.

125.    Mr. Johnson's job was not eliminated.

**SECOND CLAIM FOR RELIEF**
**(Violation of 42 U.S.C.A. § 2000e, *et seq.* - Disparate Treatment)**

126.    Mr. Johnson incorporates the foregoing and following paragraphs as though fully set forth herein.

127.    Mr. Johnson is an African American.

128.    Mr. Johnson was qualified to participate in advancement programs at SWM

129.    Mr. Johnson was rejected for the programs in question.

130.    Mr. Johnson's race was a motivating factor in Defendants' adverse employment action against him.

**THIRD CLAIM FOR RELIEF**
**(Violation of 42 U.S.C.A. §§ 1981 and 1981a - Racial Discrimination)**

131.    Mr. Johnson incorporates the foregoing and following paragraphs as though fully set forth herein.

132.    Mr. Johnson is an African American.

133.    Mr. Johnson was qualified to perform his job at SWM.

134.    Mr. Johnson was terminated because of his race.

135.    Mr. Johnson's job was not eliminated.

**FOURTH CLAIM FOR RELIEF**
**(Violation of 42 U.S.C.A. §§ 1981 and 1981a - Racial Discrimination)**

136.    Mr. Johnson incorporates the foregoing and following paragraphs as though fully set forth herein.

13

137.    Mr. Johnson is an African American.

138.    Mr. Johnson was qualified to participate in advancement programs at SWM.

139.    Mr. Johnson was rejected for the programs in question.

**140.**    Mr. Johnson's race was a motivating factor in Defendants' adverse employment action against him.

**FIFTH CLAIM FOR RELIEF**
**Denial of Equal Protection in Violation of 42 U.S.C. §1983,**
**All Defendants**

141.    Mr. Johnson incorporates the foregoing and following paragraphs as though fully set forth herein.

142.    Mr. Johnson is an African American.

143.    Mr. Johnson was terminated egregiously because of his race.

144.    Mr. Johnson was treated differently than other, similarly situated non-African American SWM employees.

145.    SWM, as a department within the City and County of Denver, is a person subject to 42 U.S.C. § 1983.

146.    Mr. Johnson's supervisors, Defendants Billings, Lutz, Pitt, Williams, and Villa, at all times relevant to the case at bar were employees of SWM and the City and County of Denver and acted under color of state law.

147.    Defendants Billings, Lutz, Pitt, Williams, and Villa had policy-making and final decision-making authority for the SWM.

148.    Defendants Billings, Lutz, Pitt, Williams, and Villa acted with reckless disregard for Mr. Johnson's Constitutional rights.

149.    At all times relevant to the case at bar SWM had a custom, policy, and practice of treating its African American employees differently than its Caucasian and Hispanic employees.

150.    The City and County of Denver failed to adequately train and supervise its managerial employees at SWM with deliberate indifference to the injuries, harms and losses such failures would cause.

151.    Defendants' denial of Mr. Johnson's Constitutional rights caused him to suffer damages.


WHEREFORE, Plaintiff, Eric Johnson, prays this Honorable Court for an award of damages in his favor and against Defendants for back pay, front pay, and compensatory damages, plus attorney fees and costs all pursuant to statute, plus statutory interest until satisfied in full, all in amounts to be determined by the trier of fact, and to grant such other, further, and different relief as the Court deems just and proper in the premises.

Dated this 28th day of July 2014.


| | |
|---|---|
| ____/s Joseph C. Cohen_____ | ____/s Elizabeth Connell_____ |
| Joseph C. Cohen, #17759 | Elizabeth Connell, #38684 |
| Joseph C. Cohen, P.C. | Matthew S. Connell, #25997 |
| 1901 West Littleton Blvd., Suite 219 | Connell and Connell |
| Littleton, Colorado 80120 | P.O. Box 343 |
| Telephone:    (303) 794-2114 | Lyons, CO 80540 |
| Facsimile:    (303) 794-3546 | 303.680.0217 |
| Email:        jcc@jccpc.com | Fax: 303.444.1915 |
| | listserv@econnelllaw.com |
| | mattconnell213@gmail.com |


## JURY TRIAL DEMAND

**Pursuant to Fed.R.Civ.P. Rule 38 (b), Mr. Johnson demands a trial to a jury trial on all matters where he is entitled to do so.**